## IN THE COMMON PLEAS COURT
## FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| **Red Zone 12 LLC** | : | |
| **511 North Park Street** | : | |
| **Columbus, OH 43215** | : | |
| | : | **Case No:** |
| **303 South Front Street LLC** | : | |
| **511 North Park Street** | : | **Judge:** |
| **Columbus, OH 43215** | : | |
| | : | |
| **Christopher J. Corso** | : | |
| **511 North Park Street** | : | |
| **Columbus, OH 43215** | : | |
| | : | |
| **Michael Gallicchio** | : | |
| **511 North Park Street** | : | |
| **Columbus, OH 43215** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **City of Columbus, Ohio** | : | |
| **90 West Broad Street** | : | |
| **Columbus, OH 43215** | : | |
| | : | |
| **Richard C. Pfeiffer, Jr.** | : | |
| **77 North Front Street** | : | |
| **Columbus, OH 43215** | : | |
| | : | |
| **Defendants.** | : | |

## COMPLAINT
### (Jury Demand Endorsed Hereon)

Plaintiffs Red Zone 12 LLC, 303 South Front Street LLC, Christopher J. Corso, and

Michael Gallicchio, for their Complaint against defendants City of Columbus, Ohio, and Richard

C. Pfeiffer, Jr., state the following:

Ex. A

I.    **Nature of the Action.**

1.     Plaintiffs bring this action and assert claims arising from the city and Mr. Pfeiffer's unlawful actions designed to take defendants' property, business, and property interests without compensation and eliminate their businesses in the city, in violation of Section 19, Article I, of the Ohio Constitution, and the Fifth and Fourteenth Amendments to the United States Constitution.

2.     Plaintiffs further assert violations of plaintiffs' due process and equal protection rights in violation of 42 USC §1983 and state and federal constitutions by defendants' actions in arbitrarily and capriciously, without any notice or warning, to deprive the plaintiffs of their property, property and business interests, and ability to conduct business by instituting, prosecuting, and maintaining a civil nuisance action against them in the Environmental Division of the Franklin County Municipal Court Case No. 2014EVH-60180, and objecting to renewal of their liquor license, when there was no rational or lawful basis to do so, and doing so only after waiting six months following an agreement reached with the city under which they resolved any differences and allowed plaintiffs to retain their property and business interests without unnecessary and/or unlawful interference or action by the city.

3.     Plaintiffs also bring claims for breach of contract, promissory estoppel, negligent misrepresentation, and for a writ of mandamus.

II.    **Jurisdiction, Venue and the Parties.**

4.     Red Zone 12 LLC is a duly formed limited liability company organized and existing under the laws of the State of Ohio which once regularly transacted business in and around central Ohio, including Franklin County. Its primary business was the management and

2

0D498 — M45 Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Mar 13 10:21 PM-17CV002503

operation of an urban nightclub business named "Red Zone" which conducted business at 303 South Front Street, Columbus Ohio from approximately December 2012 to December 22, 2013.

5.     303 South Front Street LLC is a duly formed limited liability company organized and existing under the laws of the State of Ohio which once regularly transacted business in and around central Ohio, including Franklin County.  Its primary business was to own and lease property located at 303 South Front Street in Columbus Ohio for use as an urban nightclub which conducted business there from approximately December 2012 to December 22, 2013.

6.     Plaintiffs Christopher J. Corso and Michael Gallicchio are residents of Franklin County, Ohio who are members of the Ohio limited liability companies known as Red Zone 12 LLC and/or 303 South Front Street LLC, and/or participated or assisted in the operation and management of the respective businesses.

7.     Defendant City of Columbus is a municipal corporation which is classified as a city by virtue of the Ohio Constitution.  "Article XVIII of the Ohio Constitution authorizes the creation of municipal corporations in Ohio and defines their classifications, powers and limitations.  Pursuant to section one of that Article, Columbus, Ohio is a municipal corporation classified as a city because its population is 5,000 or more, presently in excess of 750,000 persons.  Pursuant to section three, Columbus has '...authority to exercise all powers of local self-government and to adopt and enforce within...[its limits]...such local police, sanitary and other similar regulations, as are not in conflict with general laws.'  And pursuant to section seven, in 1914 Columbus adopted (and since has amended) a charter for its government and now exercises, subject to section three, all powers of local self-government."  Columbus City Attorney's Website, *About the City Attorney's Office*, p. 1.

0D498 - M46 Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Mar 13 10:21 PM-17CV002503

8. The executive and administrative power of city [Columbus] government is vested in the mayor, an elected position with a four-year term, and in "...directors of departments and other administrative officers and boards provided for...[in the charter and ordinances of the City]." *Id.*

9. "The present City Attorney is Richard C. Pfeiffer, Jr., originally appointed in January 2003 to fill a vacancy. In November 2003 he was elected to finish the unexpired term. Subsequently, he has been re-elected three times (in 2005, 2009, and 2013), with his present term ending December 31, 2017. Having served more than 12 years, he is currently the second longest serving City Attorney in Columbus history." Columbus City Attorney's Website, *About the City Attorney's Office*, p. 1.

10. Mr. Pfeiffer, as city attorney for Columbus, does not possess and is not vested with the executive and administrative power of city government for Columbus. Nonetheless, during his tenure as city attorney, he has usurped certain executive and administrative power of city government for Columbus including primarily, as it concerns this case, power to decide who does and does not conduct business within the city by use of the civil nuisance abatement action legal process as a means to control and regulate businesses which are not preferred by the city.

11. As the city attorney, Mr. Pfeiffer has instituted a "Zone Initiative Team" which he describes on his website as follows:

**"Zone Initiative Team**

This is a team of attorneys and others assembled from several divisions whose goal it is to use civil nuisance abatement actions to rid the City of dilapidated buildings. The team addresses issues from the neighborhood perspective, and focuses on what is popularly referred to as quality of life issues."

12.     Publicly available information does not reflect the date on which Mr. Pfeiffer created this "team," nor does it indicate the basis for its legal authority to act whether arising from the Ohio Constitution or the Columbus City Charter.

13.     While the "Zone Initiative Team" may ostensibly have the laudable goals of eradicating dilapidated buildings, addressing neighborhood "issues," and focusing on "quality of life issues," at some point Mr. Pfeiffer and the city improperly extended his role by assuming and/or usurping the city's authority to exercise all powers of local self government which are not in conflict with general laws. Basically, Mr. Pfeiffer took upon himself the power to decide who could conduct business in the city and who could not.

14.     Specifically, Mr. Pfeiffer and his "team" have improperly usurped control of local self government by regulating and controlling local businesses without regard to the Ohio and federal Constitutions or the city charter. They have done this, as it concerns this case, by use of civil nuisance abatement actions to regulate and control the nature and extent to which businesses and persons may conduct business within the city. By exercising regulatory control and power in this manner, Mr. Pfeiffer effectively hides the civil nuisance abatement action process behind the cloak of privileged attorney client communication and action, thereby preventing a business or property owner from determining how the city administratively decides whether a business or property constitutes a civil nuisance and should be prevented from conducting business in Columbus.

15.     Mr. Pfeiffer, and the city presumably, accomplish their mission, by declaring nuisances through the "Zone Initiative Team" which is believed to be comprised of solely lawyers in Mr. Pfeiffer's office so that their actions and conduct are protected by, or attempted to be protected by, the attorney client or other related privileges which in turn prevents property and

business owners from learning the basis for a nuisance action instituted by the city attorney in the name of the city.

16.     This court has both personal and subject matter jurisdiction over the parties to this action and venue is appropriate pursuant to Rule 3(B) of the Ohio Rules of Civil Procedure.

III.    **Facts Common To All Claims.**

17.     Red Zone 12 LLC started business in or around November 2012. Its business was to conduct, manage, and operate an urban nightclub at the property located at 303 South Front Street in Columbus, Ohio, which went by the name "Red Zone."

18.     Past ownership groups have conducted nightclub and bar businesses at the 303 South Front Street property since the mid 1990s. Messrs. Corso and Gallicchio have been involved in some but not all of the ownership groups from the 1990s through early 2014.

19.     Prior to opening the business, Red Zone 12 LLC engaged the city's police department to provide a large contingent of off duty police officers (approximately 80-100) to be employed by Red Zone to provide security in and throughout the nightclub in conjunction with a large private security presence also hired by the company. The business had police officers and security personnel at every door, and every access to the nightclub. Security and police also monitored activity within the nightclub. At the entrance, every patron or person entering was frisked and/or subject to inspection and pat downs, as well as metal and electronic monitoring. Security was heavy at the business, a large part of which included the city's off duty police officers.

20.     Red Zone's business proceeded without any significant incidents until November 10, 2013, when a random, but likely gang-related shooting occurred at Red Zone involving local gang member Freddie K. Johnson of the Short North Posse. Red Zone had a show that night

Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Mar 13 10:21 PM-17CV002503
OD498 - M49

featuring Dequantes Devontay Lamar who is better known by his stage name Rich Homie Quan,

an American hip hop recording artist from Atlanta, Georgia.

21.     Freddie Johnson was indicted in July 2014 along with 16 other members of the

Short North Posse on murder, racketeering, firearm, and other related felony charges.  The 17

accused referred to themselves as the "Cut Throat Committee" and "The Homicide Squad."  The

indictments were the result of a joint investigation by members of the FBI, Columbus police and

the Franklin County sheriff's and prosecutor's offices.  According to the indictments, members of

the gang are tied to homicides in several communities including Columbus, Zanesville,

Pickerington and Pataskala.

22.     On January 25, 2017, the Department of Justice through Benjamin C. Glassman,

United States Attorney for the Southern District of Ohio, Angela L. Byers, Special Agent in

Charge, Federal Bureau of Investigation (FBI), Timothy J. Plancon. Special Agent in Charge,

Drug Enforcement Administration (DEA), Trevor Velinor, Special Agent in Charge, Bureau of

Alcohol, Tobacco, Firearms and Explosives (ATF), Franklin County Prosecutor Ron O'Brien

and Columbus Police Chief Kim Jacobs announced the sentences handed down by U.S. District

Judge Algenon Marbley for six Short North Posse members who pleaded guilty, including

Mr. Johnson who was sentenced to 10 years in prison.

23.     Mr. Glassman publicly commended the two-year investigation by federal, state

and local law enforcement agencies, including the FBI, DEA, ATF, Columbus Police, Franklin

County Sheriff Zach Scott's Office, Franklin County Prosecutor Ron O'Brien's Office, Fairfield

County Prosecutor Gregg Marx, Licking County Prosecutor Kenneth Oswalt, Muskingum

County Prosecutor D. Michael Haddox, Ross County Prosecutor Matthew S. Schmidt, law

enforcement leaders from those counties, and officials of the Ohio Department of Rehabilitation

and Correction, as well as Assistant U.S. Attorneys David DeVillers, Kevin Kelley and Brian

Martinez and Special Assistant U.S. Attorney Jimmy Lowe with Franklin County Prosecutor

O'Brien's Office, who are representing the United States in this and the related cases, which

resulted in the convictions and prison sentences for the Short North Posse members including

Mr. Johnson.

24.     The city did not share the results of the joint investigation in which it participated

for the Freddie Johnson shooting on November 10, 2013 at Red Zone, despite repeated requests

for same. Mr. Pfeiffer and the city took the position in a nuisance action filed against the

plaintiffs that they did not have to produce this information to plaintiffs, even though they

claimed that his shooting constituted a nuisance being maintained by the plaintiffs whom they

sued as defendants in the nuisance action.

25.     Following Mr. Johnson's shooting, Red Zone 12 LLC immediately shut the

business down pending an investigation into the shooting. Approximately two weeks later, the

city police reported to Red Zone 12 LLC that the business was not responsible and did not play

any role in the shooting, was no longer at risk for a re-occurrence, and could re-open, so Red

Zone re-opened with the blessing of the city police.

26.     Once Red Zone 12 LLC had the green light from the city to re-open, it eventually

held events to stem gang violence. On December 22, 2013, another show was held at Red Zone

with the same entertainer as the night of the Johnson shooting, Rich Homie Quan, which was

promoted as an end to gang violence, and to promote peace. Late that night, though, another

shooting occurred in which a likely gang member shot and killed Jeremiah Frazier.

27.     The Columbus Dispatch reported on December 22, 2016 that, "Columbus

homicide detective Robert Wachalec said he gave his investigative packet to the Franklin County

prosecutor's office several months ago. Prosecutor Ron O'Brien confirmed that his office

reviewed the packet with the detective. 'He does have a suspect that is the subject of a

continuing investigation, but no charges have been filed to date,' O'Brien said. More

investigation is necessary, O'Brien said." The city's investigation into the Frazier shooting has

also been withheld by the city, again arguing that they can withhold what they want at their

whim, even while filing nuisance actions arising from the shooting.

28.     The city has not provided the results of its investigation for the December 22,

2013 shooting, despite requests for same. In a pending wrongful death case brought by Frazier's

family, the city refused to disclose its investigation results into his shooting, much like it did with

the plaintiffs in a nuisance action filed against them on June 11, 2014. The court decision

preventing discovery of the investigation is currently on appeal to the Franklin County Court of

Appeals.

29.     Red Zone 12 LLC immediately closed its business following the December 22,

2013 shooting pending an investigation. Messrs. Corso and Gallicchio then met with city

officials including George Speaks, and Steve Dunbar on behalf of Mr. Pfeiffer, among others, on

January 28, 2014, to discuss the shooting and the status of Red Zone. Plaintiffs were not

represented by legal counsel at the meeting. The plaintiffs were very concerned about the

incident and did their utmost in trying to ensure something like that would never occur again.

30.     Plaintiffs reached a compromise and settlement agreement on or about January

28, 2014 with the city and Mr. Pfeiffer under which the plaintiffs would agree to close the "large

nightclub" business at the property in exchange for them being able to keep a liquor license and

continue an alternative business on the property such as a restaurant, bar, grocery, carryout, or

something similar so long as it was not a "large nightclub."

31.     The city requested, promised, and agreed that if the plaintiffs immediately shut down the premises and did not conduct business there as a "large" nightclub, it would not bring legal action, object to or hinder transfer of the liquor license, and would not object to its re-opening for business as an alternative business so long as it was not a "large" nightclub. In exchange, the plaintiffs agreed to these conditions and terms with the city. The city assured and promised and agreed that it would not pursue legal action to have the premises declared to be a nuisance, would allow the liquor license to be transferred to a different location without objection, and would not therefore object to its renewal, and would agree to allow the premises to be used for an alternative business so long as it was not a "large" nightclub. These agreements are sometimes known as good neighbor agreements.

32.     In reliance on the agreement, promises, and assurances from the city and Mr. Pfeiffer, the plaintiffs immediately closed the Red Zone business, eliminated the then-existing business, evicted the tenant business operator and otherwise did everything demanded of and requested by the city and Mr. Pfeiffer. Mr. Dunbar, an assistant city attorney under Mr. Pfeiffer, offered to memorialize the agreement in writing.

33.     The city attorney's office did not forward anything for over a month to memorialize the agreement. Mr. Pfeiffer and the city apparently changed their collective minds at some later point, following which Mr. Dunbar then proposed a permanent injunction judgment against both the business owner and the property on which the business operates, even though that violated the agreement reached on January 28, 2014, under which the plaintiffs operated and relied in good faith.

34.     In May 2014, or so, the city and Mr. Pfeiffer then demanded that plaintiffs agree to a permanent injunction and that the premises never be used as a nightclub or any business for

10

0D498 - M53 Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Mar 13 10:21 PM-17CV002503

that matter selling alcoholic beverages, and objected to the liquor license renewal, all in breach of their earlier agreement. The city also would not agree to allow the license to be transferred to a new business away from the subject premises. When asked why it refused to allow transfer of the license, the city responded that it felt like the plaintiffs needed to be more severely punished even though they were not responsible for the business conducted at the premises giving rise to the problem experienced in late 2013. The city and Mr. Pfeiffer threatened to sue by filing a nuisance action if plaintiffs did not agree to a permanent injunction against the property and business. They also threatened to sue Messrs. Corso and Gallicchio if they did not force the companies to acquiesce to their demands.

35. In sum, the city and Mr. Pfeiffer reneged on their agreement with, and promises and assurances to, the plaintiffs who had performed and continue to perform all obligations under the agreement.

36. When the plaintiffs would not agree to permanently enjoin their business and the property on which it is conducted, defendants threatened to file a lawsuit in the form of a civil nuisance abatement action in the Environmental Division of the Franklin County Municipal Court.

37. In response, the plaintiffs asked that the city and Mr. Pfeiffer honor their original agreement reached on or about January 28, 2014, as noted above. Plaintiffs continued to maintain and honor their agreement with the city and kept the Red Zone closed. There was no activity in the Red Zone nor was it open for business at any time after December 22, 2013. The city and Mr. Pfeiffer refused to honor the agreement.

38. On June 11, 2014, despite the agreement which had been in place since January, and despite the fact that there was no nuisance or nuisance activity at the property, the city and

11

Mr. Pfeiffer nonetheless carried through on their threats by filing a civil nuisance action against

the plaintiffs in the Environmental Division of the Franklin County Municipal Court Case No.

2014EVH-60180, seeking a permanent injunction against both the business and property owner

essentially seeking to prevent it from conducting any business whatsoever in the premises that

involved alcohol. *See* Exhibit A. There was no nuisance in the property or the business. There

was no basis to file the lawsuit, and to file it six months after the alleged nuisance arose and had

long since been eliminated by virtue of the business closing.

39. Red Zone 12 LLC and 303 South Front Street LLC responded to the Complaint

by filing an Answer on July 10, 2014, and asserted counterclaims against the defendants.

40. The city and Mr. Pfeiffer reiterated earlier threats that if the plaintiffs did not

agree to a total permanent injunction against both the real property and business, that it would

amend the Complaint to include Messrs. Corso and Gallicchio as party defendants and seek the

same relief against them and any of their business and property interests, even though there was

no basis to either make such a threat or carry through with it.

41. Plaintiffs would not capitulate to such outrageous and unreasonable demands and

threats. The city and Mr. Pfeiffer responded by carrying out their threat to name Messrs. Corso

and Gallicchio when they filed a motion to amend the Complaint on July 11, 2014. *See* Exhibit

B. They filed the amended complaint without leave of court.

42. During litigation of the civil nuisance action, the city and Mr. Pfeiffer refused to

allow plaintiffs access to the off duty police officers who were employed by Red Zone 12 LLC.

They also refused basic discovery including the basis for the city's lawsuit against the plaintiffs,

including Messrs. Corso and Gallicchio. Defendants filed a motion for a protective order on

December 10, 2014 to stop plaintiffs from contacting their off duty officer employees.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Mar 13 10:21 PM-17CV002503
0D498 - M55

43.     Seeking to determine and learn the basis for defendants' nuisance lawsuit,

plaintiffs then served notices of depositions for the city public service director George Speaks,

assistant city attorney Steve Dunbar, and a Civ. R. 30(B)(5) witness from the city with the best

and most knowledge of the basis for the lawsuit and the allegations contained in the pleadings

filed by defendants in the case.

44.     At his deposition, Mr. Dunbar refused to answer questions about or disclose who

made the decision to file the lawsuit, what facts support the decision to file the lawsuit, and why

the lawsuit was filed.  Dunbar Dep. pp. 12-13.

45.     The city produced police detective Steve Rosser for a deposition on March 6,

2015 as the witness who had the most knowledge about the nuisance alleged to be at Red Zone

and why the nuisance lawsuit was filed.  Mr. Rosser did not receive a copy of the deposition

notice, but got an email from Steve Dunbar to appear for the deposition.  Rosser knew almost

nothing about the matters on which the city was required to produce a witness to testify on its

behalf.

46.     Rosser testified that the only reason that he appeared as the city representative for

the deposition was that he had been asked by Steve Dunbar.  Rosser Dep. p. 15.  He assisted his

partner in conducting a covert investigation into Red Zone on December 7, 2013 for underage

alcohol violations reported by another officer.

47.     Rosser testified that he had no knowledge regarding the reputation of the business

or property at 303 South Front Street even though the deposition notice sought the city witness

with most knowledge about its reputation.  *Id.* at 23 (Q. Are you familiar with the reputation

between my clients and the City of Columbus?  A. Absolutely not, no.").

48.    Rosser admitted that the investigation for underage sales was closed once Red
Zone closed and stopped doing business under its agreement with the city. *Id.* at 30 (Q. No need
for the police or the vice department to do anything further once the business closed? A. That's
correct. We couldn't do anything. Q. Was there any problem with the business after it closed?
A. None that I'm aware of.").

49.    Rosser testified that he was unaware of any nuisance activity at Red Zone
between December 2012 and December 22, 2013 other than his partner's underage investigation
for which he has no personal knowledge, and that he had not done any investigation to determine
whether either the business or property was a nuisance. *Id.* at 31.

50.    Rosser admitted that defendants did nothing to determine whether or not there
was nuisance activity at Red Zone, and that any effort in that regard stopped once Red Zone was
closed. "Q. So other than what we've talked about today, you haven't done anything to determine
whether or not there has been any nuisance activity at that establishment? A. Sir, I didn't have
the time. They closed their doors." *Id.* at 35.

51.    Rosser further conceded that once Red Zone closed, there was no nuisance
activity there and thus no basis to file a nuisance lawsuit. "Q. Okay. Obviously, there was no
nuisance activity there after it closed. Correct? A. Correct. To my knowledge, yes.
Correct. I don't know how there could be because it's closed. So yes." *Id.* at 38. Rosser is not
aware of any nuisance activity at Red Zone since December 23, 2013, nor is he aware of any
basis to file a nuisance lawsuit since then. *Id.* at 39.

52.    Rosser testified that he was unaware of Mr. Corso's reputation in the city as a
business owner. *Id.* at 50. He is also unaware of any nuisance activity at Red Zone other than an
alleged underage sale on December 7, 2013 which involved his partner, not him. *Id.* at 52.

14

53. Rosser concluded by testifying that Red Zone could not have been a nuisance once it closed: "Q. How can it be a nuisance if the place is closed? A. It cannot." *Id.* at 53.

54. City director of public safety George Speaks also testified that typically nuisance actions for bars or nightclubs will originate through the police.

55. Speaks said that investigators from the city determined whether a nuisance existed at Red Zone, but could not identify them. Speaks Dep. p. 31. Speaks testified that Mr. Corso's reputation for conducting business in the city is "excellent" and that he is a very reputable businessman in the city whom he had known for over 20 years as of his deposition. *Id.* at 33.

56. Other than the two shootings, Speaks is unaware of any other problems at Red Zone between December 2012 and December 22, 2013, and is also unaware of any complaints about the business. *Id.* at 57. In responding to discovery requests in the case, Speaks was unable to locate or produce any complaints about Red Zone. *Id.* at 57-58.

57. After the January 28 meeting, Speaks responded to the mayor's chief of staff that they had reached agreement and resolved the matter with Messrs. Corso and Gallicchio. *Id.* at 47, 71, 75.

58. Speaks said the agreement was to stop operating a large nightclub at the premises, and that Mr. Corso could pursue other opportunities, and that paper work confirming the agreement would come from Mr. Dunbar. *Id.* at 49-51, 125. Speaks considered the matter resolved after the meeting. *Id.* at 67, 69. Speaks admits that Mr. Corso has performed the agreement except for signing paper work. *Id.* at 129.

59. Mr. Speaks called the meeting with Messrs. Corso and Gallicchio on January 28, 2014 on behalf of the city. Speaks testified that they reached an agreement at the meeting to resolve their dispute:

15

Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Mar 13 10:21 PM-17CV002503
0D498 - M58

10:43:01 24 step. You conducted a meeting. You met with
10:43:04 25 Mr. Corso, you met with Mr. Gallicchio, and you had
10:43:06 1 all your investigators there and you had the city
10:43:08 2 attorney there.  And you've told me that you felt
10:43:11 3 like the matter was resolved and you had an
10:43:14 4 agreement?
10:43:14 5 A.  Correct.
10:43:15 6 Q. Subject to some paperwork coming to
10:43:17 7 Mr. Corso?
10:43:18 8 A.  Correct.

Speaks Dep. pp. 67-68.

60.     Speaks admitted that he asked Steve Dunbar why the agreement was never

reduced to writing, but refused to say what Dunbar told him.  *Id.* at 71.  Speaks stated that the

agreement was that the property would not conduct business as a large nightclub and would be

used for alternative businesses, and that there would be paper work to memorialize the

agreement.  *Id.* at 72.

61.     Speaks is unaware of any effort to resolve an alleged nuisance at Red Zone at any

time, even though the city typically works with business owners to abate a nuisance before filing

a civil nuisance action.  *Id.* at 85-87, 89-90, 93.  He has no idea why the city did not contact

plaintiffs or try to work with it prior to filing an action.

62.     Speaks is unaware of any nuisance activity at the Red Zone premises after

December 23, 2013.  *Id.* at 95, 97.

63.     Speaks is unaware of any reason for naming Messrs. Corso and Gallicchio as

defendants in an amended complaint.  *Id.* at 98-99.  The amended complaint also reduced the

alleged service runs to the Red Zone by police by over half what it originally pled in the original

complaint.  The alleged service runs also served as a purported basis to allege a nuisance even

though almost all the service calls had nothing to do with the Red Zone business or property.

16

64.     Speaks could not say why the city waited six months to file a nuisance lawsuit, nor is he aware of any instance where the city waited to file a lawsuit for such a long period of time. *Id.* at 100. During his deposition, Speaks and the city attorney refused to provide any discovery about the city's investigations into the two shootings that formed the basis for their assertion that there was a nuisance at Red Zone. *Id.* at 102-105, 109-112. In other words, the city refused and continues to refuse to produce information regarding the basis on which it sued plaintiffs for maintaining a nuisance at the premises.

65.     Speaks further admitted that the city undertook an investigation to support a nuisance lawsuit, but would not reveal what that investigation found. *Id.* at 116-118.

66.     Mr. Dunbar was also deposed on March 6, 2015 but he also refused to answer any questions designed to learn the basis for the city's nuisance lawsuit filed against the plaintiffs.

67.     Dunbar refused to say even what his role was with respect to the nuisance action filed against the plaintiffs based on the work product and attorney client privileges, and also refused to provide any information related to the lawsuit. Dunbar Dep. pp. 9-11. Dunbar refused to disclose any factual basis for filing the nuisance action. *Id.* at 12. The city insulated itself from any questions seeking to learn the basis for its nuisance action by placing all responsibility for the action in the city attorney. *Id.* at 13. Dunbar would only say that he determined that there was a factual basis for filing the suit, but would not reveal any facts supporting his decision. *Id.* at 14-16.

68.     Dunbar refused to say whether there was any contact between the city and plaintiffs before December 23, 2013. *Id.* at 16, 18.

17

69.    Dunbar refused to even say who the witnesses were on behalf of the city as to the alleged nuisance. *Id.* at 21. He refused to testify about witnesses listed on the city's witness list. *Id.* at 22-23.

70.    Dunbar hedged on what he told Mr. Corso about the paper work he would send him to memorialize the agreement reached on January 28, 2014 with the city. *Id.* at 26-27. He said that he told him he would send a "complaint and agreed entry" even though he knows that Mr. Corso is not a lawyer and would not understand the distinction in legal documents or what the names mean. *Id.* at 27-29.

71.    Dunbar testified that the "agreement" "for him" was not "resolved" because he had not yet sent paper work. *Id.* at 29. Dunbar says that there was no agreement because he never got Mr. Corso to sign an "agreed entry" against the business and property owner. *Id.* at 31-32. Mr. Dunbar however never denied that an agreement was reached, only that he never had paper work signed to memorialize the agreement.

72.    Dunbar refused to answer almost every question at his deposition designed to determine why the city filed a nuisance lawsuit against the plaintiffs on June 11, 2014, and what facts supported the filing of the action at the time it was filed.

73.    The city and Mr. Pfeiffer refused to dismiss their nuisance action filed in the Environmental Division of the Franklin County Municipal Court Case No. 2014EVH-60180. Plaintiffs continued to suffer heavy damages in that they could not conduct business at the premises due to their agreement with the city, and the city later attempted to obtain an injunction against plaintiffs to permanently prohibit the business from operating at the premises. This caused a great cloud over the business and property. Eventually the pressure worked because the plaintiffs could not continue to afford to litigate while their business was also closed and unable

18

0D498 - M61 Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Mar 13 10:21 PM-17CV002503

to be re-opened or generate income as an ongoing business. Unable to sustain these losses, plaintiffs then sold the underlying property at a significant loss and also lost their business being conducted at the premises.

74.     The city would not relent in its nuisance action. Eventually, the city filed a motion for summary judgment on the merits of the case, while the plaintiffs filed a motion to dismiss the case.

75.     On January 15, 2016, the environmental court issued an order and entry staying the proceedings so that plaintiffs could try to consummate a sale of the property to cut its losses. It also announced its intent to dismiss the nuisance case once the proposed sale was consummated. The city opposed the effort and demanded that the court grant it summary judgment and impose a permanent injunction against all the plaintiffs and their business. The city and Mr. Pfeiffer's efforts to impose this upon the plaintiffs and continue the nuisance action were outrageous, unlawful, and totally unwarranted.

76.     The environmental court noted in its January 15 entry that the proposed sale would provide the city with its best outcome, and that there was no chance of the city being successful in its action for a nuisance. The city disagreed vehemently and implored the court to again grant it summary judgment, and impose the harshest penalty possible on the plaintiffs. The city filed a motion for reconsideration of the court's January 15 entry.

77.     Finding no merit to the city and Mr. Pfeiffer's positions in the nuisance case, on March 11, 2016, the environmental court filed a decision and entry denying the city's motion to reconsider, denying its motion for summary judgment as moot, and dismissing the nuisance action as well as plaintiffs' counterclaims asserted in that case without prejudice. *See* Exhibit C. The court held that plaintiffs' claims against the defendants (counterclaims in the nuisance

19

Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Mar 13 10:21 PM-17CV002503
0D498 - M62

action) were better suited to be filed in the common pleas court. Exhibit C, Entry of Dismissal, pp. 6-7. The court also noted that the city did not even allege that there was any other business or property operated by plaintiffs which would warrant a county wide prohibition against them. Their allegations and the entire nuisance action were malicious and designed solely to hurt plaintiffs without regard to the complete lack of legal merit to their actions. The city did not appeal the environmental court's decisions, nor has it ever re-filed a nuisance action against any of the plaintiffs.

### Count One – Violations of Plaintiffs' Constitutional Rights + Violations of 42 USC §1983

78. Plaintiffs restate the allegations set forth above in paragraphs 1-77 as if fully restated herein.

79. The city and Mr. Pfeiffer have wrongfully and unlawfully taken plaintiffs' business, property, property rights, and property interests without compensation, in violation of Section 19, Article I, of the Ohio Constitution, and the Fifth and Fourteenth Amendments to the United States Constitution. The city and Mr. Pfeiffer have also violated the due process and equal protection clauses in violation of 42 USC §1983 by arbitrarily and capriciously, without any notice or warning, or any rational basis, taking actions described more fully above to deprive the plaintiffs of their business, property rights, and property interests and ability to conduct business by instituting a nuisance action and objecting to renewal of their liquor license when there was no rational basis to do so, and doing so six months after reaching an agreement under which the city and plaintiffs had agreed that plaintiffs would be able to retain their property and business without interference or action by the city to otherwise interfere and attempt to take their property as the city and Mr. Pfeiffer attempted to do in a nuisance action. The city aggressively pursued a nuisance action even though it routinely allows other similar businesses and business

owners to conduct similar businesses without city interference or objection under worse
circumstances than those alleged to have occurred in this case by the city for which it claims a
right to injunctive relief.

80.     Ohio recognizes the right of a property owner to use his property for a lawful
purpose which cannot be restricted or interfered with by the city for arbitrary and discriminatory
reasons. "[T]his right, judicially enforceable under state law, is a 'legitimate claim of
entitlement' that is constitutionally protected from arbitrary deprivation. Roth, 408 U.S. at 577,
92 S. Ct. at 2709. See also Wilkerson v. Johnson, 699 F.2d 325, 328 (6th Cir.1983) ('When
governmental institutions regulate careers or occupations in the public interest through the
licensing process, their definitions of rights in a license or other statutory entitlement may give
rise to competition rights and constraints that define property interests.')" *Zaintz v. City of
Albuquerque*, 739 F. Supp. 1462, 1468 (D.N.M. 1990).

81.     The city and Mr. Pfeiffer's actions as described more fully above also constitute
violations of substantive due process in that they are arbitrary and capricious, and have no
substantial relation to the general welfare. *Id.* at 469. These actions are actionable claims under
42 U.S.C. §1983 because the defendants were at all times acting under color of state law, and
their unmitigated conduct deprived the plaintiffs of rights secured by federal law, and plaintiffs
incurred damages arising directly from defendants' unconstitutional policies and customs. "To
establish a prima facie case under 42 U.S.C. §1983, a plaintiff must prove 1) the defendant was
acting under the color of state law, and 2) the offending conduct deprived the plaintiff of rights
secured by federal law. Parratt v. Taylor, 451 U.S. 527 (1981); see also Lambert v. Hartman,
517 F.3d 433, 439 (6th Cir. 2008), quoting Bloch v. Ribar, 156 F.3d 673, 677 (6th Cir. 1998).
'To succeed on a §1983 claim against a local government, the plaintiff must also prove that the

0D498 – M64  Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Mar 13 10:21 PM-17CV002503

injury about which she complains was caused by an unconstitutional government policy or custom.' Lambert, 517 F.3d at 439, citing Monell v. Dep't Of Soc. Servs., 436 U.S. 658, 694 (1978)('[I]t is when execution of a government's policy or custom... inflicts the injury that the government as an entity is responsible under §1983.')" *Mallory v. City of Riverside*, 3:13-cv-220 (S.D. Ohio August 4, 2014). In this case, the city and Mr. Pfeiffer have acted to deprive the plaintiffs of their rights to fairly and lawfully conduct business in the city free from interference or obstruction by the city, earn a living, pursue an occupation, use their property so long as they comply with the laws and regulations applicable to such use which they did for the relatively short time that the business was open at the subject premises.

82.     The city and Mr. Pfeiffer have misused its/their power and legal authority in bringing the nuisance action and in objecting to renewal of the liquor license with the ulterior purpose of eliminating the plaintiffs' lawful business simply because it does not like the type of customers who frequent "hip hop" nights that the plaintiffs sometimes conducted which are popular with minorities and urban youth known to live in urban areas. The "intentional misapplication of state licensing law to keep plaintiff from obtaining an occupational license was conduct sufficient to violate due process." "In so holding, the court identified two factors discussed by the Supreme Court in Hampton v. Mow Sung Wong, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976) that need to be considered in cases involving governmental interference with the freedom to pursue an occupation. Id. at 328. These factors are (1) the nature and seriousness of the infringement and (2) the strength of the justifications given. Id. Based on these factors, the court upheld the jury's finding that 'the infringement caused by the defendant officials was *harassment and delay* in allowing plaintiffs to pursue their occupation,' and that

22

0D498 - M65 Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Mar 13 10:21 PM-17CV002503

this conduct was the result of the defendants' desire 'to deter plaintiffs from opening their shop next to [one of the licensing official's] barber shop.' Id. (Emphasis added)." *Id.* at 469.

83. Similarly, the city in this case never notified defendants of any nuisance activities allegedly occurring at the premises, as is its policy when working with businesses and property owners to abate and eliminate nuisance activity. The bottom line is that the city decided for entirely arbitrary and capricious reasons that it did not want a nightclub or other related business which might serve alcohol to operate in this area, so it fabricated the nuisance action as the only means to eliminate the business and ability of the premises owners to ever conduct such a business on this property again. The city took this action even though there are other similar businesses and properties nearby with far greater problems and issues which the city has not addressed nor sued.

84. As a direct and proximate result of the repeated constitutional violations of 42 USC §1983 and the Ohio and federal Constitutions, the defendants have been damaged in an amount exceeding $25,000 to be proven at trial.

<b>Count Two – Breach of Contract</b>

85. The plaintiffs restate the allegations set forth above in paragraphs 1-84 as if fully restated herein.

86. The city and plaintiffs reached an agreement as described more fully above. The city breached by repudiating the agreement and refusing to honor the agreement when asked to do so by the plaintiffs even though the plaintiffs admittedly performed the agreement and continue to honor the agreement to this day.

87. The plaintiffs abided by and honored each obligation and then some under the agreement. They met and exceeded their obligations under the agreement, and continue to do so.

88.     The plaintiffs honored and met all obligations under the agreement and performed all duties required thereunder.  The plaintiffs are at a loss to understand the city's decision to repudiate their agreement.

89.     As a direct and proximate result of the city's breaches of the agreement, the plaintiffs have been damaged in an amount exceeding $25,000, to be proven at trial.

**Count Three – Promissory Estoppel**

90.     The plaintiffs restate the allegations set forth above in paragraphs 1-89 as if fully restated herein.

91.     The defendants made clear and unambiguous promises to plaintiffs, as described more fully above.  The plaintiffs relied upon the promises by closing the then existing business, evicting the tenant business operator, and agreeing not to ever again allow a "large" nightclub business in the premises.  Plaintiffs' reliance was reasonable as well because in exchange the city agreed not to bring a nuisance action or object to renewal of the liquor license.  The defendants' damage is readily apparent in that the plaintiffs have lost substantial business income and rent from December 22, 2013 to the present due to the closing when they could have easily continued and not evicted the tenant, are likely to lose their liquor license and the ability to transfer it to a new location, and had to defend themselves in the nuisance action when they reached an agreement that supposedly prevented the action from being filed.

92.     "Promissory estoppels applies 'where there is '(1) a clear and unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) reliance is reasonable and foreseeable; and (4) the party seeking to enforce the agreement is injured as a result of its reliance.' Huntington Natl. Bank v. Antrobius, 11th Dist. Portage No. 2012-P-0036, 2012-Ohio-5936, ¶31, quoting Stonecreek Prop. LTD. v. Ravenna Sav. Bank, 11th Dist. Portage

24

0D498 - M67 Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Mar 13 10:21 PM-17CV002503

No. 2002-P-0129, 2004-Ohio-3679, ¶48." *Hylbert v. WEB Building and Development, Inc.*, 2014-Ohio-2456, at ¶20.

93.     As a direct and proximate result, the plaintiffs have been damaged in an amount exceeding $25,000 to be proven at trial.

### Count Four –Negligent Misrepresentation

94.     The plaintiffs restate the allegations set forth above in paragraphs 1-93 as if fully restated herein.

95.     The city and Mr. Pfeiffer misled plaintiffs by representing that in exchange for them shutting down the existing business, evicting the tenant, and agreeing not to conduct a large nightclub business in the premises again, it would refrain from legal action such as the nuisance action, refrain from objecting to renewal of the liquor license, and not pursue other potential penalties or actions against the plaintiffs relative to their business and use of the subject premises.

96.     "One who, in the course of his business, profession, or employment, or any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, [and is therefore] subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Lawarre v. Fifth Third Secs., Inc.*, 2012-Ohio-4016, at ¶126. The city negligently supplied false information to the defendants who reasonably relied on that information in agreeing to close their business and agree to other restrictions so long as the city forbeared from suing them and objecting to their liquor license renewal.

97.     As a direct and proximate result, the defendants have been damaged in an amount exceeding $25,000 to be proven at trial.

## Count Five – Writ of Mandamus

98.     The plaintiffs restate the allegations set forth above in paragraphs 1-97 as if fully restated herein.

99.     Ohio law allows a plaintiff to seek a writ of mandamus "to compel public authorities to institute appropriation proceedings where an involuntary taking of private property is alleged." *State ex rel. Preschool Development, Ltd. v. City of Springboro*, 99 Ohio St.3d 347, 792 N.E.2d 721, 724 (Ohio 2003). The city's baseless actions including the filing of the nuisance action and objecting to renewal of plaintiffs' liquor license, and constitute an unlawful use of government power designed to eliminate plaintiffs' business and to foreclose them from conducting lawful business at the premises or in the county in the future without properly compensating them for taking their business and property without just compensation. The city does not like the fact that plaintiffs conducted business which serves minorities and others, primarily African Americans, who enjoy and frequent the "hip hop" and "rap" nights. The city's actions amount to an unlawful taking of private property as well as to prevent the lawful conduct of business on and at the subject premises. The city has unlawfully discriminated against the plaintiffs and their customers solely because the city seeks to protect wealthier non-minority businesses and persons who live or conduct business nearby the subject premises.

100.    The city's actions constitute arbitrary and capricious conduct sufficient to implicate plaintiffs' substantive due process rights and an involuntary taking of their private property. Plaintiffs have a right to be free from arbitrary or irrational nuisance actions and objections to their liquor license, both of which are protected by the principle of substantive due

26

0D498 — M69 Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Mar 13 10:21 PM-17CV002503

process. The city's actions are and have been arbitrary or irrational, having no substantial relation to the general welfare of the city or its citizens, and serve no legitimate governmental purposes.

101.    "R.C. 2731.01 provides: 'Mandamus is a writ, issued in the name of the state to an inferior tribunal, a corporation, board, or person, commanding the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station.' 'Mandamus is the appropriate action to compel public authorities to commence appropriation cases when an involuntary taking of private property is alleged.'" *State v. Village of Obetz*, 2008-Ohio-4064, at ¶4. Mandamus is an appropriate action under the circumstances to force the city to commence appropriation proceedings to fairly and properly take the defendants' business and property and to properly compensate them for doing so. Using instead the nuisance action as a means to do that which they are otherwise prohibited from doing is a gross abuse of the legal process and violates both the state and federal constitutions.

102.    "To be entitled to a writ of mandamus, relator must show (1) a clear legal right to the relief requested; (2) respondents are under a clear legal duty to perform the act sought; and (3) relator has no plain and adequate remedy at law. State ex rel. Fain v. Summit Cty. Adult Probation Dept. (1995), 71 Ohio St.3d 658, citing State ex. rel. Howard v. Ferreri (1994), 70 Ohio St.3d 587, 589. To constitute an adequate remedy at law, the alternative must be complete, beneficial, and speedy." *Id.* at ¶5. Plaintiffs have a clear legal right to the requested relief, and the city is under a clear legal duty to compensate them for taking their property and business without just compensation, and the plaintiffs have no plain and adequate remedy at law.

0D498 - M70   Franklin County Ohio Clerk of Courts of the Common Pleas- 2017 Mar 13 10:21 PM-17CV002503

103.   As a direct and proximate result, the plaintiffs are entitled to a writ of mandamus ordering the city to properly commence appropriation proceedings pursuant to R.C. 163 for its improper taking of their business and property interests without just compensation.

**WHEREFORE**, plaintiffs 303 South Front Street LLC, Red Zone 12 LLC, Christopher Corso and Michael Gallicchio, respectfully demand judgment be granted in their favor on all claims against Columbus City Attorney Richard C. Pfeiffer Jr. and City of Columbus, jointly and severally, in an amount exceeding $25,000 for compensatory, statutory, and punitive damages, where applicable, to be proven at trial; interest on all damages granted from December 22, 2013; court costs; a writ of mandamus ordering that the city commence appropriation proceedings under R.C. 163; and that they be granted their reasonable costs and attorneys' fees, and whatever further relief the Court deems just and appropriate.

Respectfully submitted,

*/s/ James P. Connors*
James P. Connors, Esq. (0034651)
**LAW OFFICES OF JAMES P. CONNORS**
580 South High Street, Suite 150
Columbus, OH 43215
(614) 221-6868
FAX (614) 221-6889
jclaw221@aol.com
*Counsel for Plaintiffs*

## JURY DEMAND

Plaintiffs hereby demand a jury of eight (8) for all triable jury issues contained herein and any claim or defense asserted in this action.

*/s/ James P. Connors*
*Counsel for Plaintiffs*